Alan KAHN, derivatively on Behalf of DEKALB GENETICS CORPORATION, Plaintiff Below, Appellant,

v.

Charles C. ROBERTS, Richard O. Ryan, Paul R. Judy, Bruce P. Bickner, Thomas H. Roberts, III, Thomas H. Roberts, Jr., John R. Nelson, Douglas C. Roberts, Paul F. Cornelsen, Charles J. Arntzen, Allan Aves, H. Blair White and Dekalb Genetics Corporation, Defendants Below, Appellees.

No. 9, 1996.

Supreme Court of Delaware.

Submitted: June 13, 1996.
Decided: July 25, 1996.

Gary W. Aber, Heiman, Aber & Goldlust, Wilmington, and Curtis V. Trinko and Timothy J. MacFall (argued), Law Offices of Curtis V. Trinko, L.L.P., New York City, for Appellant.

Martin P. Tully, Morris, Nichols, Arsht & Tunnell, Wilmington, and Jeremy G. Epstein (argued), Margaret A. Helen Macfarlane, and Ann M. Vermes, Shearman & Sterling, New York City, for Appellees Charles C. Roberts, Richard O. Ryan, Paul R. Judy, Bruce P. Bickner, John R. Nelson, Douglas C. Roberts, Paul F. Cornelsen, Charles J. Arntzen, Allan Aves and H. Blair White.

Stephen E. Jenkins, Ashby & Geddes, Wilmington, for Appellee DeKalb Genetics Corporation.

Edward P. Welch, Karen L. Valihura (argued), and Karen M. Bab, Skadden, Arps, Slate, Meagher & Flom, Wilmington, for Thomas H. Roberts, Jr. and Thomas H. Roberts, III.

Before VEASEY, C.J., WALSH, and HOLLAND, JJ.

WALSH, Justice.

Plaintiff Alan Kahn ("Kahn") appeals the dismissal of his claims of breach of the duties of care and disclosure in connection with a buyback of one-third of the outstanding stock of DeKalb Genetics Corporation ("DeKalb"). Kahn argues that the DeKalb directors' actions do not withstand the judicial scrutiny required under *Unocal Corp. v. Mesa Petroleum Co.*, Del.Supr., 493 A.2d 946 (1985), and that the board violated its duty of disclosure.

The Court of Chancery correctly held that no enhanced judicial scrutiny of the transaction under *Unocal* is required. With respect to the disclosure claim, the Court of Chancery ruled that no duty of disclosure arises where the board of directors undertakes to disclose information in a context wherein shareholder action is not implicated. Since the alleged deficiencies are immaterial in any event, we need not reach the issue of the scope of the duty of disclosure, but hold that lack of materiality of the alleged omissions precludes recovery.

Accordingly, the decision of the Court of Chancery is affirmed.

## I.

The factual background leading to this dispute is viewed from a perspective which favors Kahn as the party resisting summary judgment.

DeKalb engages in the production and marketing of corn and soybean seed product lines, swine and poultry production, and biotechnology research. It has a dual capitalization structure, consisting of Class A and Class B stock. Class A stockholders and Class B stockholders have the same rights to dividends and other distributions, but Class B stockholders have no voting rights other than required by Delaware law. No national securities exchange trades the Class A stock, but Class B trades on the NASDAQ over-the-counter market. For corporate purposes, DeKalb values the Class A stock at the market price of the Class B stock.

In December, 1990, Thomas Roberts, Jr., Thomas Roberts, III and their families [1] collectively owned one-third of the Class A and Class B stock of DeKalb. In the first half of 1990, John R. Nelson ("Nelson"), the executive manager of one of DeKalb's business segments, DeKalb Poultry Research, Inc. ("DPRI"), resigned. Thomas Roberts, III headed the international marketing division and showed interest in succeeding Nelson. Bruce P. Bickner ("Bickner"), who was the chairman of the board, and Richard O. Ryan ("Ryan"), another director, were responsible for selecting Nelson's successor. They chose someone other than Thomas Roberts, III for the position.

This selection process disappointed Thomas Roberts, III and his father Thomas Roberts, Jr. As a result, they suggested to Bickner and Ryan that the Roberts family would "rethink" its position as large DeKalb stockholders.

Thomas Roberts, III faced further disappointment. After the United States Customs Agency audited DPRI's international sales in October, 1990, Bickner requested that Thomas Roberts, III resign because of alleged irregularities. Thomas Roberts, III tendered his resignation shortly thereafter, to be effective March 30, 1991. Despite the severance of the employment relationship, Thomas Roberts, III did not leave his position as a director of DeKalb for more than two years after his resignation.

As a result of its disenchantment with DeKalb, the Roberts family determined to reduce or sever its financial ties with the company. In December 1990, Thomas Roberts, Jr. approached Charles Roberts, suggesting the Charles Roberts family purchase the Roberts family stock. Then in January 1991, Thomas Roberts, Jr. proposed to Charles Roberts that the two jointly recommend that the DeKalb board sell the company because, in the view of Thomas Roberts, Jr., DeKalb was financially unable to keep pace with its primary competitor, Pioneer Hi-Bred International, Inc. Charles Roberts was unreceptive to both proposals.

Shortly thereafter, Thomas Roberts, Jr. approached Charles Roberts and Bickner with still another proposal: that DeKalb repurchase the Roberts' family stock. Bickner sought the assistance of Merrill Lynch & Company to evaluate whether DeKalb should sell itself, the status and effectiveness of DeKalb's research, the competitiveness of DeKalb's product line, and the financial future of the company in general. Bickner also retained Shearman & Sterling as legal counsel for DeKalb.

On May 23, 1991, the DeKalb board held a special meeting to discuss the concerns Thomas Roberts, Jr. had originally raised about deficiencies in the seed research program. At the meeting, Thomas Roberts, Jr. expressed his view that these failings ultimately would result in loss of DeKalb's market share and he urged a sale or merger of the company. DeKalb's head of Plant Genetics gave a presentation rebutting Thomas Roberts, Jr.'s concern. Agreeing with the rebuttal presentation, Bickner expressed his view that current policies had been effective

---

1. Thomas Roberts, Jr. and Thomas Roberts, III are referred to together as the "Thomas Roberts defendants." The Thomas Roberts defendants and their families are collectively referred to as the "Roberts family."

and that DeKalb should remain independent. After deliberating, the board rejected Thomas Roberts, Jr.'s recommendation and passed a resolution, by a vote of nine to three, that it was in the best interest of DeKalb and its stockholders to remain independent. Only Thomas Roberts, Jr., Thomas Roberts, III, and Paul R. Judy ("Judy") voted against the resolution.

After the board's rejection of the proposal to sell the company, Merrill Lynch met with financial advisors and attorneys representing the Roberts family concerning the family's interest in selling their DeKalb Class A and Class B stock.

The full board considered the issue of a possible repurchase of the Roberts family stock at its regular meeting on July 1, 1991. During this meeting, after the Thomas Roberts Defendants departed, the remainder of the board met with Douglas Brown ("Brown") of Merrill Lynch. Brown supported the repurchase of the Roberts family stock. In addition to this recommendation, Merrill Lynch presented the board with several options, including the possibility of generating a sale of the entire company to a "hostile" outsider and the possibility of a "poison pill" to discourage sale of DeKalb. Consistent with its earlier determinations to maintain DeKalb as an independent corporation, the board sought further consideration of a repurchase of the Roberts family's shares. Brown advised the board that a repurchase price of $40 per share for the Class A Stock would be a beneficial transaction for DeKalb.

The Merrill Lynch presentation apparently was sufficiently persuasive to prompt the board to consider seriously the repurchase of the Roberts family stock. To that end, at the July 1, 1991 meeting, the board appointed a Special Committee of six outside directors to oversee and to conduct discussions between the Company and the Roberts family. Allan Aves ("Aves"), Charles J. Arntzen ("Arntzen"), Paul F. Cornelsen ("Cornelsen"), Judy, Nelson, and Blair White

("White") comprised the Special Committee. This committee was also responsible for recommending to the full board the terms for any repurchase.

Four days later, the Special Committee conducted a telephonic meeting. All directors except the Thomas Roberts defendants participated. The Special Committee concluded that, should DeKalb go forward with the repurchase, it not pay more than $40 per share for the voting Class A stock. It also determined DeKalb should not purchase the Roberts family's non-voting Class B stock.

On July 7, 1991, the board again met by telephone to decide whether to go forward with the repurchase. During that meeting, Merrill Lynch reviewed the materials it had distributed at the regular board meeting and again advised that the repurchase of the Roberts family stock would be a good transaction for DeKalb. At this meeting, the board unanimously adopted a resolution authorizing Bickner to enter into an agreement with the Roberts family to purchase their shares at $40 per share of voting Class A Stock.

In a letter to the shareholders dated July 15, 1991, Bickner announced the repurchase of the Roberts family's DeKalb Class A stock for $40 per share. He also stated that bank borrowing would finance the repurchase and made the following statement which became the focus of Kahn's disclosure claim: "We view this repurchase as a positive move. It is a good transaction for the company, and one that allows certain Roberts family members to diversify their holdings and gain the liquidity they sought."

## II.

Kahn filed suit on October 24, 1991 alleging violations of the directors' fiduciary duties.[2] Specifically, Kahn claimed that the directors had breached their duty of disclosure by failing to disclose all material facts surrounding the repurchase; approved an

---

2. Kahn named as defendants DeKalb and the members of the DeKalb board at the time of the repurchase: Arntzen, Aves, Bickner, Cornelsen, Judy, Nelson, Charles C. Roberts, Douglas C. Roberts, Ryan, and White (collectively "director defendants"), as well as Thomas H. Roberts, Jr., and Thomas H. Roberts, III.

excessively high repurchase price; and acted with the intent to entrench themselves in office. The disclosure claim was brought as a class action, while the other allegations were brought derivatively on behalf of De-Kalb.

The defendants moved for judgment on the pleadings. On February 28, 1994, the Court of Chancery dismissed all of the claims against the Thomas Roberts defendants except for the disclosure claim. *Kahn v. Roberts,* Del.Ch., C.A. No. 12324, 1994 WL 70118, Hartnett, V.C. (Feb. 28, 1994). With respect to the disclosure claim, the court held that only further development of the factual record would indicate "whether the allegedly withheld information might assume actual significance in the deliberations of a reasonable stockholder as to his investment objectives." Mem. op. at 9.

On December 6, 1995, following discovery, the Court of Chancery addressed the remaining claims of breach of the duties of care and disclosure against the director defendants and the breach of the duty of disclosure against the Thomas Roberts defendants in the context of the defendants' motion for summary judgment. Finding that no material factual disputes existed and drawing all reasonable inferences in favor of Kahn, the court granted summary judgment for the defendants on all claims.

Addressing the duty of care issue, the court found that the directors' actions were protected by the business judgment rule. No enhanced judicial scrutiny was required, according to the Court of Chancery, since Kahn conceded in briefing to that court that under no objective view of the facts could a reasonable threat to corporate control have existed. In addition, the Vice Chancellor was of the opinion that there was "no reasonable basis to conclude ... a 'legally cognizable threat' " was presented by the Thomas Roberts defendants' actions. The court further found that the directors had availed themselves of all available material information and had conducted their investigation and approval of the repurchase with appropriate deliberation.

Turning to the duty of candor claim, the court found that such duty did not exist since

the board was not seeking shareholder action with respect to the underlying transaction. Consequently, the court dismissed these claims without determining whether or not the letter to shareholders was materially misleading because of omissions or misstatements.

## III.

■ We review *de novo* the ruling of the Court of Chancery that, as a matter of law, no material factual disputes existed and Kahn could not prevail on his claims given the undisputed facts of the case. *Merrill v. Crothall–American, Inc.,* Del.Supr., 606 A.2d 96, 100 (1992). Given a paper record, nothing impedes this Court's independent review to reach its own conclusions whether any material issues of fact remain unresolved. *Id.* Thus, when reviewing a grant of summary judgment, we accord no deference to the rulings of law and the conclusion that no material facts are controverted. *Id.*

## IV.

■ Kahn first argues that the Court of Chancery erred in holding that the directors did not violate their fiduciary duties in authorizing the repurchase in response to a threat to corporate control. When a board of directors responds to a threat to corporate policy or effectiveness, there is "the omnipresent specter that [it] may be acting primarily in its own interests, rather than those of the corporation and its shareholders." *Unocal Corp. v. Mesa Petroleum Corp.,* Del. Supr., 493 A.2d 946, 954 (1985). Because the directors' fiduciary duty to serve the corporation conflicts with their own self-interest, the presumption of propriety under the business judgment rule does not protect their actions. *Id.* Instead, the board's actions must withstand enhanced judicial scrutiny. *Id.*

Kahn argues that such enhanced scrutiny of the stock repurchase is appropriate and dictates a finding that the directors violated their fiduciary duties. His argument is two-pronged. Kahn argues first that the board's actions in buying back the Roberts family's shares were a defensive measure in response to a threat to control of DeKalb. Kahn then

asserts that the board's actions cannot withstand *Unocal*'s heightened analysis because there were "no reasonable grounds to believe that the vague assertions purportedly made by Thomas Roberts, Jr. ... constituted a legally cognizable threat to DeKalb's corporate policy or effectiveness." Kahn made similar arguments before the Court of Chancery.

The Court of Chancery dismissed Kahn's *Unocal* claim because Kahn took contradictory positions in briefing and because from an objective standpoint no threat existed. The Court of Chancery held that, since no threat to corporate control existed, the business judgment rule applied. We concur in the determination that the DeKalb board's actions were not a violation of fiduciary norms under *Unocal* and its progeny.

The business judgment rule normally protects all lawful actions of a board of directors, provided they were taken in good faith, after a reasonable deliberative process and in the absence of conflicts of interest. *Aronson v. Lewis*, Del.Supr., 473 A.2d 805, 812 (1984). Where, however, the board takes defensive action in response to a threat to the board's control of the corporation's business and policy direction, a heightened standard of judicial review applies because of the temptation for directors to seek to remain at the corporate helm in order to protect their own powers and perquisites.[3] Such self-interested behavior may occur even when the best interests of the shareholders and corporation dictate an alternative course. Thus, where the board perceives a threat, its response will not be upheld merely because the response serves "any rational business purpose." *Unocal*, 493 A.2d at 954 (quoting *Sinclair Oil Corp. v. Levien*, Del.Supr., 280 A.2d 717, 720 (1971)).

Unitrin, Inc. v. American General Corp., Del.Supr., 651 A.2d 1361, 1373 (1995), explained the judicial scrutiny that a board's actions would face during contests for corporate control.

> [B]efore the board is accorded the protection of the business judgment rule, and that rule's concomitant placement of the burden to rebut its presumption on the plaintiff, the board must carry its own initial two-part burden:
>
> > First, ... that the board of directors had reasonable grounds for believing that a danger to corporate policy and effectiveness existed, and
> >
> > Second, ... that the board of directors' defensive response was reasonable in relation to the threat posed.

*Id.* Kahn argues that the factual circumstances surrounding the repurchase require the application of this test and that the directors cannot meet its burden.

The threshold question is determining the standard of judicial review of the directors' decision to repurchase one-third of DeKalb's outstanding shares. The *Unocal* standard applies if the directors initiated the repurchase in response to a threat to corporate policy related to a potential change in control of the corporation. *In re Santa Fe Pacific Corp. Shareholder Litig.*, Del.Supr., 669 A.2d 59, 71 (1995); *Stroud v. Grace*, Del.Supr., 606 A.2d 75, 82 (1992).

The weakness of Kahn's assertion that *Unocal* is applicable is belied by the inconsistencies in his argument. On appeal, Kahn argues both that the directors perceived a threat to corporate control[4] and that "the defendants [cannot] establish that they truly perceived a legally cognizable threat to DeKalb's corporate policy and effectiveness."[5]

---

3. In *Bennett v. Propp*, Del.Supr., 187 A.2d 405, 409 (1962), we recognized "the inherent danger in the purchase of shares with corporate funds to remove a threat to corporate policy when a threat to control is involved. The directors are of necessity confronted with a conflict of interest, and an objective decision is difficult."

4. Kahn asserts that "the unambiguous testimony of defendant Bickner demonstrates that the members of the DeKalb Board of Directors did, in fact, perceive Thomas Roberts, Jr.'s willingness to sell [their] holdings to an 'outsider' as a threat to the established corporate control of the Company." Op.Br. at 20.

5. Shortly after urging for the application of the *Unocal* standard because of the existence of a threat to corporate control, Kahn argued

> that the vague assertion made by Thomas Roberts, Jr., that if his family's stock were not purchased by either the other Roberts family members or the Company he would sell to a

In making this latter assertion, Kahn is attacking an *assumption* of the first prong of the *Unocal* test described above. If this assumption is false, the *Unocal* standard should not be applied. In questioning this premise, Kahn attacks the very basis for the application of the test and undermines the relevance of *Unocal* analysis. Kahn's line of argument indicates that the repurchase by DeKalb was not the type of response to a threat to corporate control which implicates the concerns of entrenchment and conflict requiring heightened judicial scrutiny.

Even apart from the logical circuity of Kahn's argument, we find that the factual circumstances do not warrant the application of *Unocal* to the repurchase of the DeKalb shares, and we therefore decline to do so. This is not the case where one-third of the outstanding shares are being sought by a third party, or a self-tender for those shares was made in the face of a third party bid for control. Such situations might bring about a change in control and be closer to the *Unocal* paradigm. *Cf. Santa Fe*, 669 A.2d at 65, 71–72 (*Unocal* applicable in hostile tender offer situation). Here the corporation sought to repurchase its own shares in a situation where there was no hostile bidder.[6] Nothing in the record indicates that there was a real probability of any hostile acquiror emerging or that the corporation was "in play." Furthermore, the board acted to remove disgruntled shareholders, *see Cheff v. Mathes*, 199 A.2d at 554, not in contemplation of an ephemeral threat that could somehow materialize at some point in the future, *cf. Moran*

"hostile" outsider, did not constitute a legally cognizable threat to DeKalb's corporate policy or effectiveness so as to warrant the defensive measures undertaken by the DeKalb board....

Even assuming, *arguendo*, however that the defendants could somehow establish that they truly perceived a legally cognizable threat to DeKalb's corporate policy and effectiveness—which they cannot—under the second prong of the *Unocal* test, defendants must establish that their defensive actions were reasonable responses to the perceived threat.

Op.Br. at 22–23.

**6.** The result we reach here is consistent with earlier decisions of this Court. We have repeatedly ruled that a board may repurchase the stock of a dissatisfied shareholder without implicating heightened scrutiny. *Grobow v. Perot*, Del.Supr., 539 A.2d 180, 188 (1988).

*v. Household Internat'l, Inc.*, Del.Supr., 500 A.2d 1346, 1350–53 (1985) (*Unocal* applied where measure was enacted in contemplation of contest for control even though no contest for control was imminent).

■ Absent an actual threat to corporate control or action substantially taken for the purpose of entrenchment, the actions of the board are judged under the business judgment rule. *See Stroud*, 606 A.2d at 83. Kahn has not presented evidence to overcome the presumption of propriety that accompanies this rule for actions taken in good faith and after reasonable investigation by independent directors. *See Aronson v. Lewis*, 473 A.2d at 812. The repurchase was approved after the board established an independent committee, consulted with legal and financial advisors and considered its options over the course of several meetings. *Cf. Smith v. Van Gorkom*, Del.Supr., 488 A.2d 858, 874 (1985). Further analysis of the repurchase is unnecessary to sustain the board's decision as a sound exercise of business judgment.

## V.

The Court of Chancery held that the director defendants were not under a duty to make any disclosures since a shareholder vote was not being sought. Kahn argues that the trial court erred because "[e]ven if defendants were under no initial duty to disclose all information about the repurchase agreement, once they undertook to disclose

[I]f the actions of the board were motivated by a sincere belief that the buying out of the dissident stockholder was necessary to maintain what the board believed to be proper business practices, the board will not be held liable for such decision, even though hindsight indicates the decision was not the wisest course. On the other hand, if the board has acted solely or primarily because of the desire to perpetuate themselves in office, the use of corporate funds for such purposes is improper.

*Cheff v. Mathes*, Del.Supr., 199 A.2d 548, 554 (1964) (citations omitted). Even defensive repurchases—where the motive of entrenchment looms in the background—may meet the requirements of reasonableness and proportionality. *See Polk v. Good*, Del.Supr., 507 A.2d 531, 537 (1986).

information about the repurchase, the defendants were obligated to fully and fairly disclose all material information about the repurchase." Op.Br. at 25. Even assuming the existence of the duty of disclosure in this case, Kahn has failed to show any material omissions or misstatements. His claim of breach of the duty of disclosure therefore fails.

This Court has held that full disclosure is required when management is seeking stockholder action. *E.g., Arnold v. Society for Savings Bancorp., Inc.*, Del.Supr., 650 A.2d 1270, 1277 (1994); *Stroud*, 606 A.2d at 84; *Lynch v. Vickers Energy Corp.*, Del.Supr., 383 A.2d 278, 279 (1977). Notably, this Court has never stated that full disclosure is required *only when* seeking shareholder action.[7] Because none of the disclosure violations alleged by Kahn are material, we need not and do not reach today the question of whether a duty of disclosure exists absent shareholder action. *See In re Rexene Corp. Shareholders Litig.*, Del.Ch., C.A. Nos. 10897 & 11300, mem. op. at 10 & n. 1, 1991 WL 77529, Berger, V.C. (May 8, 1991), *aff'd*, Del. Supr., 604 A.2d 416 (1991). Even if the duty of disclosure is implicated here, such a duty lacks a factual basis.

■ Kahn challenges the defendants' characterization of the repurchase of Thomas Roberts' shares as a good transaction and a positive move for the company. Specifically, Kahn alleges two omitted facts. First, he alleges that the company should have disclosed that the repurchase caused DeKalb to incur $18 million in debt. Second, he contends that DeKalb should have disclosed that the Roberts family sold their investment in DeKalb because they were dissatisfied with company policies which threatened DeKalb's competitiveness.

Kahn has failed to prove a cause of action under the duty of disclosure that he himself advocates. If there is any duty, it extends only to material factual omissions or misstatements. *See Kelly v. Bell*, Del.Ch., 254 A.2d 62, 71 (1969), *aff'd*, Del.Supr., 266 A.2d 878 (1970) ("[D]irectors owe a duty to honestly disclose all material facts when they undertake to give out statements about the business to stockholders."). Since Kahn complains only of non-material deficiencies in the disclosure, he cannot recover.[8]

As to the amount of debt financing for the repurchase, the board did fully disclose the relevant facts. It disclosed that the buyback would be debt financed, the number of shares and the price per share. Simple multiplication would have revealed the allegedly omitted fact. Thus, no material information was withheld and no breach of duty occurred. *Cinerama, Inc. v. Technicolor, Inc.*, Del.Ch.,

---

7. The Court of Chancery has not spoken with a unified voice on this question. *Compare Bragger v. Budacz*, Del.Ch., C.A. No. 13376, 1994 WL 698609, Allen, C. (Dec. 7, 1994) (dismissing claims that information statement issued in connection with a spin-off was misleading because, *inter alia*, no shareholder action had been sought); *Herd v. Major Realty Corp.*, Del.Ch., C.A. No. 10707, 1990 WL 212307, Chandler, V.C. (Dec. 21, 1990) (no duty of disclosure absent shareholder vote); *and Raskin v. Birmingham Steel Corp*, Del.Ch., C.A. No. 11365, mem. op. at 10–11, 1990 WL 193326, Allen, C. (Dec. 4, 1990) ("[S]ince the company did not seek the vote of the shareholders, offer them an exchange, or otherwise seek any action from them," the board "has no distinctive state law duty to disclose material developments with respect to the company's business.") *with Kahn v. Roberts*, Del.Ch., C.A. No. 12324, mem. op. at 7–9, 1994 WL 70118, Hartnett, V.C. (Feb. 28, 1994) (no dismissal of disclosure claim when directors volunteer information even though stockholder approval was not needed or sought); *Levy v. Stern*, Del.Ch., C.A. No. 11955, Berger, V.C. (Feb. 7, 1994) (plaintiffs stated a claim for violation of duty of disclosure even though no shareholder action was requested and no stock transaction occurred); *Marhart, Inc. v. CalMat Co.*, Del.Ch., C.A. No. 11820, 1992 WL 82365, Berger, V.C. (Apr. 22, 1992); *Freedman v. Restaurant Assocs. Indus., Inc.*, Del.Ch., C.A. No. 9212, mem. op. at 19, 1990 WL 135923, Allen, C. (Sept. 21, 1990) ("Although management may have no general obligation to disclose its purposes or motivation, once it undertook to disclose its purpose in revising the offer, it had an obligation to do so truthfully and candidly."); *and Kelly v. Bell*, Del.Ch., 254 A.2d 62, 71 (1969), *aff'd*, Del.Supr., 266 A.2d 878 (1970).

8. A fact is material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Rosenblatt v. Getty Oil Co.*, Del.Supr., 493 A.2d 929, 944 (1985) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976)).

C.A. No. 8358, slip op. at 59–60, 1991 WL 111134, Allen, C. (June 24, 1991), *aff'd in part, rev'd in part on other grounds sub nom. Cede & Co. v. Technicolor, Inc.*, Del. Supr., 634 A.2d 345, 372 (1993).

■ Kahn alleges that the letter was misleading in that it stated that the Thomas Roberts family's motivation was to diversify its holdings when their true reason for selling was DeKalb's decreasing competitiveness. The director defendants' disagreed with the Thomas Roberts defendants' claims that DeKalb was losing its competitive edge. These assertions were speculative and not shared by a majority of the DeKalb board. The director defendants were under no duty to disclose views with which they disagreed and thought were unsupported.[9] *See Arnold,*

650 A.2d at 1280 (no duty to disclose unreliable or speculative information).

In conclusion, the Court of Chancery correctly granted summary judgment in favor of the defendants. Kahn's contentions on appeal are meritless. He alleges only nonmaterial omissions from the letter to the shareholders describing the repurchase. In addition, the DeKalb directors were not responding to a threat to corporate control in approving the repurchase, so their decision is protected by the business judgment rule. The decision below is therefore affirmed.

---

9. DeKalb's reason for pursuing the repurchase, however, may have been material to a stockholder seeking to evaluate his investment in DeKalb.