[676 NYS2d 531]

CHARLES WILSON et al., Appellants, v DANIEL P. TULLY et al., Respondents.

First Department, June 18, 1998

## APPEARANCES OF COUNSEL

*Abraham Rappaport* of counsel (*Jill S. Abrams, Robin F. Zwerling, Nancy Kaboolian, Dan Drachler* and *Joseph S. Tusa* on the brief; *Abbey, Gardy & Squitieri, L. L. P., Morris & Morris,* and *Zwerling, Schachter & Zwerling, L. L. P.*, attorneys), for appellants.

*Dennis J. Block* of counsel (*Stephen A. Radin, Jason M. Halper, John F.X. Peloso* and *Kevin T. Rover* on the brief; *Weil, Gotshal & Manges, L. L. P.*, and *Morgan, Lewis & Bockius, L. L. P.*, attorneys), for respondents and nominal defendant-respondent.

## OPINION OF THE COURT

ANDRIAS, J.

The issue in this stockholder's derivative action is whether plaintiffs' failure to demand, prior to suit, that Merrill Lynch's board of directors take some action on their complaint is fatal to their action.

The complaint asserts three causes of action: (1) intentional and/or reckless breaches of the defendant directors' fiduciary duties to the Company and its shareholders, (2) indemnification, and (3) waste. It alleges, in pertinent part, that one of Merrill Lynch's brokers, defendant Michael Stamenson, became an investment advisor to the Treasurer-Tax Collector of Orange County, California, and, as a result, Merrill Lynch sold Orange County $4.9 billion in derivative instruments, defined by plaintiffs as financial arrangements in which the payoff is linked to, or derives from, the performance of some underlying security such as stocks, bonds or other assets. Eighty per cent of the derivatives were "inverse floaters", which pay a floating rate of interest inversely related to a benchmark or index rate. Thus, when the applicable index rate goes down, the floating rate increases along with the value of the inverse floater and vice versa.

It is alleged that to enable Orange County to leverage its portfolio, ultimately to $20.6 billion, Merrill Lynch also entered into "reverse repurchase agreements" (reverse repos) with the County, whereby the investor uses a combination of invested cash and loan proceeds to buy additional securities, using the securities themselves as collateral for the transaction. Due to increases in interest rates beginning in late 1993 and particularly after February 1994, the value of Orange County's portfolio declined sharply and it sustained losses totalling approximately $2 billion. As a result, the County and its Investment Pools filed for bankruptcy on December 6, 1994.

The complaint further alleges that defendant directors knew or should have known that in the early 1980's Merrill Lynch, through, *inter alia*, Stamenson, along with numerous other Wall Street brokerage firms, had sold the City of San Jose virtually identical highly leveraged securities, which, as the result of a sharp increase in interest rates in 1984, resulted in a $60 million loss. San Jose sued Merrill Lynch and 12 other brokerage houses and Merrill Lynch later contributed $750,000 to a $26 million fund to settle the lawsuit against it and the other brokerage firms.

It is also alleged that, in 1993, Merrill Lynch made the "extraordinary" decision to offer to buy Orange County's entire derivative portfolio for $3.5 billion, which offer was refused in a letter from Orange County's Treasurer in which he stated that "it was only after extensive consultation with highly placed Merrill Lynch officials by conference call, in person, and in writing well over a year ago that we felt secure in investing an even larger percentage of our portfolio in derivatives securities."

Plaintiffs allege that the defendant directors ignored or failed in their fiduciary duty to be apprised of the foregoing and other "red flags" and, knowing the extent of Orange County's reliance on Merrill Lynch, defendant board knew or recklessly disregarded Merrill Lynch's fiduciary duty, as Orange County's investment advisor, not to sell it any more unsuitable securities or loan it more capital to leverage Orange County's assets in anticipation of decreasing interest rates.

The IAS Court, in granting defendants' motion to dismiss for plaintiffs' failure to make the prelitigation demand required by Delaware Rules of Chancery Court, rule 23.1, held that plaintiffs' conclusory allegations, unsupported by allegations of specific fact, were insufficient to establish that such a demand would have been futile. We agree.

The law of Delaware, the State of Merrill Lynch's incorporation, is controlling (*see, Hart v General Motors Corp.*, 129 AD2d 179, 182-183, *lv denied* 70 NY2d 608, citing *Diamond v Oreamuno*, 24 NY2d 494, 503-504) and, under Delaware law, as elsewhere, the requirement of a demand upon directors of a corporation to pursue a derivative complaint is a recognition of the inherent powers of the board to manage the affairs of the corporation, which includes making decisions about whether or not to pursue such litigation (*Zapata Corp. v Maldonado*, 430 A2d 779, 782 [Del]). The Delaware Supreme Court has observed that, as here, stockholders often do not make such demand, but instead bring suit, claiming that demand is excused. However, it stated: "Because such derivative suits challenge the propriety of decisions made by directors pursuant to their managerial authority, we have repeatedly held that the stockholder plaintiffs must overcome the powerful presumptions of the business judgment rule before they will be permitted to pursue the derivative claim" (*Rales v Blasband*, 634 A2d 927, 933 [Del] [citations omitted]).

Although no demand will be required where it would be futile, the Delaware Supreme Court has held, in *Aronson v Lewis* (473 A2d 805, 812 [Del]), that "the entire question of demand futility is inextricably bound to issues of business judgment and the standards of that doctrine's applicability. The business judgment rule is an acknowledgement of the managerial prerogatives of Delaware directors * * * [and] is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company" (citations omitted). Proper business judgment includes both substantive due care (the terms of the transaction) and procedural due care (an informed decision) (*Grobow v Perot*, 539 A2d 180, 189 [Del]).

Approval of a transaction by a majority of independent, disinterested directors almost always bolsters a presumption that the business judgment rule attaches to transactions approved by a board of directors that are later attacked on grounds of lack of due care. In such cases, a heavy burden falls on a plaintiff to avoid presuit demand (*Grobow v Perot, supra*, at 190).

Where, as here, there is no claim that a majority of the defendant directors are not disinterested and independent, "the mere threat of personal liability for approving a questioned transaction, standing alone, is insufficient to challenge either

the independence or disinterestedness of directors, although in rare cases a transaction may be so egregious on its face that board approval cannot meet the test of business judgment, and a substantial likelihood of director liability therefore exists" (*Aronson v Lewis, supra*, at 815).

Likewise, where the certificate of incorporation exempts directors from liability, the risk of liability does not disable them from considering a demand fairly unless particularized pleading permits the court to conclude that there is a substantial likelihood that their conduct, such as bad faith, intentional misconduct, knowing violation of law, or any other conduct for which the directors may be liable, falls outside the exemption (*In re Baxter Intl., Inc. Shareholders Litig.*, 654 A2d 1268, 1270 [Del]).

The entire review is factual in nature and, in determining demand futility, a court "in the proper exercise of its discretion must decide whether, under the particularized facts alleged, a reasonable doubt is created that: (1) the directors are disinterested and independent and (2) the challenged transaction was otherwise the product of a valid exercise of business judgment." (*Aronson v Lewis, supra*, at 814.)

Similarly, consistent with the context and rationale of *Aronson*, a court should not apply the *Aronson* test for demand futility where the board that would be considering the demand did not make the business decision that is being challenged. Thus, where inaction, rather than action, by a board is charged and "directors are sued derivatively because they have failed to do something (such as a failure to oversee subordinates), demand should not be excused automatically in the absence of allegations demonstrating why the board is incapable of considering a demand. Indeed, requiring demand in such circumstances is consistent with the board's managerial prerogatives because it permits the board to have the opportunity to take action where it has not previously considered doing so" (*Rales v Blasband*, 634 A2d 927, 933-934, n 9, *supra*).

In such a case, "it is appropriate * * * to examine whether the board that would be addressing the demand can impartially consider its merits without being influenced by improper considerations. Thus, a court must determine whether or not the particularized factual allegations of a derivative stockholder complaint create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand." (*Supra*, at 934.)

Plaintiffs, in seeking to excuse their failure to make a pre-suit demand, allege that the defendant directors either wittingly or unwittingly permitted the allegedly illegal course of conduct to develop and continue to the point where Merrill Lynch was exposed to enormous legal liability and that, in so doing, they violated their fiduciary duty to monitor Merrill Lynch's corporate affairs. It has been said that such a claim is possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment. (*In re Caremark Intl. Inc. Derivative Litig.*, 698 A2d 959, 967 [Del].)

It is also "well-settled that mere allegations of participation in the approval of a challenged transaction are insufficient to excuse a pre-suit demand" and conclusory allegations of recklessness or gross negligence are "insufficient to overcome the strong presumption of propriety afforded by the business judgment rule" (*Emerald Partners v Berlin*, 1993 Del Ch LEXIS 273, *12, *14 [Dec. 23, 1993, Hartnett, V.C.] [citations omitted]).

While the court will accept well-pleaded facts as true, it will not take as true conclusory allegations of fact or law not supported by allegations of specific fact (*Grobow v Perot, supra,* at 187). "A trial court need not blindly accept as true all allegations, nor must it draw all inferences from them in plaintiffs' favor unless they are reasonable inferences" (*supra,* at 187).

In seeking to overcome that strong presumption and to impute knowledge of the alleged illegality of Merrill Lynch's dealings with Orange County, plaintiffs allege that, at least by 1991, the individual defendant directors knew or recklessly disregarded Stamenson's history of selling highly leveraged, inappropriate investment products to municipal customers, "*potentially* in violation of applicable federal and state law" (emphasis added). However, elsewhere in the complaint, in quoting a 1994 newspaper article, they acknowledge that five bills approved by the California Legislature since 1987 "widened counties' authority to put local tax money into more exotic investments" and that "Merrill Lynch was quick to take advantage of the relaxed investment guidelines [it] fought so hard to achieve". Nowhere in their 68-page complaint do plaintiffs point to any specific conduct of the individual directors or board resolution relating to Orange County, but rely upon conclusory allegations that the defendant directors "knew or recklessly disregarded" or "knew or were reckless in not knowing" of Merrill Lynch's perilous course of conduct, thereby exposing the Company to numerous lawsuits and substantial damages.

Even assuming the possible illegality of Merrill Lynch's dealings with Orange County, demand would still not be excused absent specific allegations of self-dealing or bias on the part of a majority of the board. As noted by the Second Circuit: "Derivative suits are almost invariably directed at major, allegedly illegal, corporate transactions. By virtue of their offices, directors ordinarily participate in the decision making involved in such transactions. * * * Excusing demand on the mere basis of prior board acquiescence, therefore, would obviate the need for demand in practically every case" (*Lewis v Graves*, 701 F2d 245, 248 [citation omitted]; *see also, Richardson v Graves*, 1983 Del Ch LEXIS 466, *9-10 [June 17, 1983, Longobardi, V.C.] [unreported opn] ["Alleging the illegality of the board's election as a basis for the futility of a demand is a bootstrap attempt to harness all the rest of the conclusory allegations to support this conclusion. Without a proper foundation, the house of cards must inevitably topple"]).

Plaintiffs point to press reports of "internal squabbling regarding Merrill Lynch's aggressive sales practices toward Orange County" and that "top Merrill Lynch & Co. executives battled fiercely with one another over whether to rein in their business with the county". They also allege that the defendant directors "made a conscious decision to authorize or permit" the complained-of misconduct; however, such conclusory allegation is again unsupported by particularized facts. Even if it were, it does not constitute gross negligence, which, in the corporate context, means " 'reckless indifference to or a deliberate disregard of the whole body of stockholders' or actions which are 'without the bounds of reason' " (*Tomczak v Morton Thiokol, Inc.*, 1990 Del Ch LEXIS 47, *35 [Apr. 5, 1990, Hartnett, V.C.], quoting *Allaun v Consolidated Oil Co.*, 147 A 257, 261).

As to Merrill Lynch's decision to settle the San Jose litigation for $750,000, and its offer to buy back Orange County's derivatives portfolio, there are no particularized facts alleged that would create a reasonable doubt that they were anything but sound "business decisions" made with the best interests of Merrill Lynch in mind. There is no allegation that the buyback offer was unreasonably high or low or did not reflect the actual market value of the portfolio. Instead, plaintiffs claim that "the major concern of Merrill Lynch's senior managers was not what losses the Orange County investment fund might suffer as a result of transactions entered into with Merrill Lynch, rather, the Company's concerns centered around the

potential financial exposure Merrill Lynch itself might face in light of the fact that it was lending billions of dollars under reverse repurchase agreements with illiquid, unstable securities—in large part the inverse floaters and quasi-governmental agency notes Merrill Lynch itself had sold to Orange County—as collateral".

Thus, it is just as reasonable to conclude that, if in fact the defendant directors were asked to approve the buy-back offer, they determined that such offer was in the best interests of Merrill Lynch. As stated in an April 5, 1995 Wall Street Journal article quoted by plaintiffs, "The risk managers' primary concern was a simple one: losing money. Merrill was lending against illiquid, volatile securities as collateral, and could have been on the hook for millions." Certainly, such decision does not appear "so extreme or curious as to itself raise a legitimate ground to justify further inquiry and judicial review" (*Kahn v Tremont Corp.*, 1994 Del Ch LEXIS 41, *20 [Apr. 21, 1994, Allen, C.]).

Likewise, plaintiffs have failed to plead with the requisite factual particularity that there is a reasonable doubt that the defendant directors lacked the necessary independence and were incapable of considering a demand and exercising their sound business judgment in deciding whether or not to pursue this derivative suit. A director is " 'independent' " if that director is capable of making decisions for the corporation based on the merits of the subject rather than " 'extraneous considerations or influences' " (*Williams v Geier*, 671 A2d 1368, 1377 [Del]). As a practical matter, where, as plaintiffs allege, Merrill Lynch is named as a defendant in at least 10 separate actions and class actions, its board of directors, who would be important witnesses for the corporation in those suits as well as in this derivative suit, could reasonably conclude, on the advice of counsel, that it is in the best interests of Merrill Lynch and its stockholders to vigorously defend or even settle those suits, rather than pursuing this diametrically opposed derivative suit (*see, In re E.F. Hutton Banking Practices Litig.*, 634 F Supp 265, 269-270).

In *Rales v Blasband* (*supra*), by the time the issue of demand futility was presented to the Delaware Supreme Court on a certified question, there had already been a prior judicial finding by the Third Circuit Court of Appeals that plaintiff had pleaded facts raising at least a reasonable doubt that the defendant board validly exercised its business judgment. "Such determination", the *Rales* court held, "indicates that the

potential for liability is not 'a mere threat' but instead may rise to 'a substantial likelihood' [citation omitted]" (634 A2d, *supra,* at 936). In the instant case, despite all of plaintiffs' conclusory allegations, there is no well-grounded evidentiary showing that a reasonable doubt exists as to whether any of the defendant directors' alleged actions or inaction with regard to the so-called "red flags" cited by plaintiffs were other than valid exercises of the directors' business judgment and fiduciary responsibility to Merrill Lynch. The gravamen of a director's fiduciary duty is the obligation of loyalty to the corporation (*Kahn v Roberts,* 1995 Del Ch LEXIS 151, *10 [Dec. 6, 1995, Steele, V.C.] [*affd* 679 A2d 460], citing *Cinerama, Inc. v Technicolor, Inc.,* 1991 Del Ch LEXIS 105 [June 21, 1991, Allen, C.]).

Unlike *Miller v Schreyer* (200 AD2d 492), a decision criticized as wrongly decided by both our Court of Appeals in *Marx v Akers* (88 NY2d 189, 200) and the Delaware Court of Chancery in *In re Baxter Intl., Inc. Shareholders Litig.* (654 A2d 1268, 1271, *supra),* which involved a five-year, $900 million, admittedly illegal, securities "parking scheme", here, any illegality involved in selling derivatives to San Jose in the early 80's had apparently been remedied consciously by Merrill Lynch, not by stopping such sales, but by lobbying to have legislation passed, which plaintiffs admit permitted Orange County's investment in such exotic investments. Despite plaintiffs' conclusory allegations that Orange County was "ill-equipped to make the complex financial analysis required to understand derivatives", there is no showing that the risks of its investment strategy were not well known by the County.

Plaintiffs' allegations support the business judgment rule presumption as much as they seek to overcome it. The complaint acknowledges that Merrill Lynch earned $35 to 40 million in commission revenues in 1992 and well in excess of $100 million in fees and commissions in 1993 and 1994 as a result of its aggressive sales to Orange County and that, by 1993, profits from Merrill Lynch's municipal financing activities had risen dramatically to constitute between 5% and 10% of the Company's entire annual revenues. They also cite press reports that, despite internal memoranda urging caution, some Merrill Lynch executives continued to aggressively seek profits from the "fast-growing business" and that Merrill Lynch undertook these sales despite unanimous agreement at the highest levels of the Company that they constituted a substantial risk to both the Company and Orange County.

However, risk is at the heart of Merrill Lynch's business, or for that matter any business, and it seems as if the risk entailed resulted, for a substantial period of time, in what plaintiffs describe as "huge fees and commissions to the company" and, presumably, financial benefit to Orange County. The further allegation that these huge fees and expenses "were at the expense of Orange County and the result of breaches of fiduciary duties owed by the Company to Orange County" is again conclusory and, therefore, insufficient to overcome the business judgment presumption that any action or inaction on the part of the defendant directors with regard to Merrill Lynch's dealings with Orange County was taken in good faith in what they thought was the best interests of the Company at that time.

That, in hindsight, such action or inaction may turn out to be controversial, unpopular or even wrong is insufficient to excuse plaintiffs' failure to make a demand upon Merrill Lynch's directors (*see, Grobow v Perot*, 526 A2d 914, 928 [Del]). As stated by the court in *In re Caremark Intl. Inc. Derivative Litig.* (*supra*, 698 A2d, at 967), "whether a judge or jury considering the matter after the fact, believes a decision substantively wrong, or degrees of wrong extending through 'stupid' to 'egregious' or 'irrational', provides no ground for director liability, so long as the court determines that the process employed was either rational or employed in a good faith effort to advance corporate interests." The hard core of the business judgment doctrine is that the business outcome of an investment project that is unaffected by director self-interest or bad faith cannot itself be an occasion for director liability. (*Gagliardi v Trifoods Intl.*, 683 A2d 1049, 1051 [Del].)

Thus, as can be seen, although the Delaware Supreme Court has refused to establish a particular "reasonable doubt" standard and each court must employ an objective analysis to determine whether a plaintiff's complaint contains the facts necessary to support a finding of reasonable doubt of director disinterest or independence, or proper business judgment (*Benerofe v Jung Woong Cha*, 1996 Del Ch LEXIS 115, *16 [Sept. 12, 1996, Chandler, V.C.], citing *Grobow v Perot*, 539 A2d, *supra,* at 186), in seeking to excuse demand futility, whether improper action or inaction is alleged, "[i]t is evident from recent Delaware cases that the standard is very high" (*Potter v Pohlad*, 560 NW2d 389, 392 [Minn]). In fact, the *Gagliardi* court remarked that the theoretical exception alluded to in *Aronson* (*supra*), that some decisions may be so "'egregious'"

that liability for losses they cause may follow even in the absence of conflict of interest or improper motivation, has resulted in no money judgments against corporate officers or directors in Delaware (683 A2d, *supra*, at 1051-1052).

Applying the foregoing standards to the complaint in this action, we find that the IAS Court properly found that plaintiffs have failed to allege, with the necessary particularity, facts that would support a conclusion that any presuit demand by them would have been futile.

Accordingly, the judgment of the Supreme Court, New York County (Ira Gammerman, J.), entered August 28, 1996, which dismissed the action as against all defendants, should be affirmed, with costs. The appeal from the order, same court and Justice, entered August 13, 1996, which granted defendants' motion to dismiss the complaint for failure to make a prelitigation demand, should be dismissed, without costs, as subsumed in the appeal from the subsequent judgment entered thereon.

SULLIVAN, J. P., ROSENBERGER and WILLIAMS, JJ., concur.

Judgment, Supreme Court, New York County, entered August 28, 1996, affirmed, with costs. Appeal from order, same court and Justice, entered August 13, 1996, dismissed, without costs, as subsumed in the appeal from the judgment entered thereon.