[775 NYS2d 313]

Joel Simon et al., Respondents, v Hans W. Becherer et al., Appellants.

First Department, April 27, 2004

## APPEARANCES OF COUNSEL

*Sullivan & Cromwell LLP* (*Michael A. Cooper* and *Carla Bedrosian* of counsel), for Hans Becherer and others, appellants.

*J.P. Morgan Chase & Co. Legal Department* (*Ahuva Genack, Mark E. Segall* and *Kent T. Stauffer* of counsel), for J.P. Morgan Chase & Co., appellant.

*Wechsler Harwood LLP* (*Robert I. Harwood* and *Samuel K. Rosen* of counsel), *Faruqi & Faruqi, LLP* (*Nadeem Faruqi* and *Shane T. Rowley* of counsel), *Berger & Montague, P.C.* (*Sherrie R. Savett* and *Michael T. Fantini* of counsel), *Spector, Roseman & Kodroff, P.C.* (*Robert M. Roseman* of counsel), *Schiffrin Barroway, LLP* and *James Orman* for respondents.

## OPINION OF THE COURT

WILLIAMS, J.

The question before us is whether, pursuant to Delaware law, the complaint in this shareholder derivative action should have been dismissed because plaintiffs failed to plead the requisite particularized facts establishing that a pre-suit demand on the corporation's board of directors was excused because the board was not disinterested and independent and thus, that a demand for the board to pursue this action would have been futile.

The plaintiffs, five individuals and one corporation, all allegedly shareholders of nominal defendant J.P. Morgan Chase & Co. (Chase) at the time of the transactions in question, brought this shareholder derivative action against members of the board of directors of Chase (the Board), with regard to Chase's role in the infamous December 2001 collapse of the Enron Corporation (Enron). Chase, incorporated under the laws of Delaware, is a global financial services firm, formed by the December 31, 2000 merger of Chase Manhattan Corporation and J.P. Morgan & Co.,

Inc. (Morgan), with operations in over 50 countries; Enron, incorporated under the laws of Oregon, is an energy company with its principal place of business in Houston, Texas.

The individual defendants are 11 of the 12 current members of the Chase Board, three former members of that Board and seven former members of the Chase Manhattan Board. All but one of the current Board members are "outside" directors, i.e., neither officers nor employees of Chase; the only "inside" director is Chase chairman and CEO William B. Harrison, Jr.

This lawsuit is a consolidation of five similar shareholder derivative actions filed in 2002 and it is the second consolidated amended stockholder derivative complaint that is the subject of the appeal at bar. The gravamen of the complaint is that Chase and its premerger predecessors entered into six fraudulent transactions with Enron. These transactions were allegedly disguised loans that would appear as revenue on Enron's books, fraudulently boosting liquidity and earnings, while actually concealing the approximately $3.9 billion of debt that should have appeared on the balance sheet. Allegedly, the transactions between Enron and Chase entities Mahonia Limited or Mahonia Natural Gas Limited (collectively, Mahonia) involved natural gas futures contracts (the forward sale commodities contracts), which were executed during the period December 1997 through December 2000. The contracts called for future delivery of crude oil or natural gas by Enron to Mahonia, which had prepaid Enron a fixed amount. Meanwhile, Mahonia and Chase purportedly entered into parallel contemporaneous contracts wherein Chase paid the same amount to Mahonia that Mahonia paid to Enron and Mahonia would deliver to Chase crude oil or natural gas at the same times and in the same volumes that Enron was to deliver to Mahonia. The bottom line in these transactions, allegedly, was that only the monies involved would ever change hands, not any oil or gas.

The complaint alleges two causes of action against all of the individual Board member defendants, the first for breach of fiduciary duty and the second for gross mismanagement. The first cause of action alleges that the directors breached their fiduciary duties by "acquiescing in, approving, and/or directing decisions" to have Chase "engage in high-risk multi-million dollar transactions with Enron." It also alleges that the Board's "Audit and Risk Policy Committees breached their fiduciary duties by failing to perform their crucial watchdog functions." The second cause of action states that the Board grossly

mismanaged or aided and abetted the gross mismanagement of Chase's assets by "subjecting [the Corporation] to the unreasonable risk of substantial losses by failing responsibly and with due care to oversee and implement proper business and financial practices at [Chase]."

In support of these claims, plaintiffs allege that although the directors may have been unaware of the Enron transactions, lawsuits brought in 1999 by the Sumitomo Corporation (Sumitomo) against Chase involved the same scheme and should have "put them on notice of the risks of using Forward Sale Contracts to disguise loans, and of the need to create a proper internal reporting and control system." In the Sumitomo matter, Chase allegedly set up transactions that disguised as copper swaps the loans made to a copper trader to cover his $2.6 billion losses on copper trades conducted on behalf of Sumitomo. Chase settled that suit in April 2002 by agreeing to pay Sumitomo $125 million.

Furthermore, it is alleged that prior to the merger, between June 29, 1998 and December 28, 2000, Chase's predecessor Morgan, aware of Enron's true financial status and seeking security against the risk of Enron's inability to repay the loans, induced 11 insurance carriers, who relied upon the apparently sound terms of the forward sale contracts, to issue six separate surety bonds totaling over $1 billion in favor of Chase and Mahonia insuring Enron's performance under the contracts.

Subsequent to the merger, Chase allegedly continued to use the forward sale contract scheme to disguise loans to Enron. On September 28, 2001, they entered into another series of these transactions that disguised an addition $350 million in new bank loans. In this instance, Chase obtained a letter of credit from Westdeutsche Landesbank Girozentrale (WestLB) to insure itself against Enron defaulting on repayment of the loans. By this time, the forward sale contract scheme had allegedly funneled $4 billion to Enron.

Plaintiffs alleged that Chase participated in other schemes to funnel funds to Enron. Chase and Enron set up a series of transactions with two partnerships, LJM1 and LJM2, controlled by Enron's chief financial officer. These transactions allowed Enron to report inflated returns from apparently legitimate dealings. It was alleged that top Chase executives were allowed to personally invest in the lucrative LJM2 partnership, and that Chase received large underwriting and consulting fees and interest payments. It was also alleged that Chase, in 2000 and 2001,

issued credit default option contracts, wherein Chase was liable for Enron's publicly traded debt if Enron defaulted within a certain period.

Enron's house of cards began to collapse in mid-October 2001 with its first disclosure of accounting fraud, i.e., that it had previously reported assets that were overvalued by over $1 billion and that it would restate its financial results for the years 1997 through 2000 and the first two quarters of 2001. The disclosure caused a flood of shareholder suits for securities fraud, Congressional inquiries and investigations by the Securities and Exchange Commission (SEC) and other government agencies. This in turn prompted, in November 2001, requests to Chase by the 11 insurance carriers for documents relating to the surety bonds they had issued in order to determine whether they were liable. Chase either flatly refused to provide the documents or selectively responded to the requests, which were both made informally and filed in bankruptcy court. At the same time, allegedly, Chase was frantically seeking to prevent Enron's bankruptcy by attempting to arrange a sale of Enron to another company. As part of this effort, it is alleged that defendant William Harrison, Chase Board chairman and CEO, phoned Moody's, the rating service, and pressured it to keep Enron's favorable credit rating in place until the sale could be effected. Soon thereafter, the sale negotiations collapsed and in December 2001 Enron filed for bankruptcy.

At this point, Chase tried to collect from the insurers and WestLB, who refused to pay, alleging that they had been fraudulently induced into issuing their respective guarantees for the disguised loans. Chase brought actions against them which resulted in a settlement with the insurance carriers, which left Chase holding over $400 million in unpaid Enron loans; the WestLB action was still pending in England when this appeal was filed.

As a consequence of Chase's alleged misconduct, plaintiffs assert that Chase has been exposed to approximately $1.1 billion in financial loss directly related to the Mahonia-Enron transactions, and to massive, additional potential liability/loss from: numerous securities class actions by Chase's shareholders; the Enron securities litigation class action brought by Enron shareholders against Enron, Chase and others; numerous governmental investigations, including one by the SEC to determine whether Chase aided Enron in falsifying its financials; an examination by the Federal Reserve Bank of New York

to determine whether Chase accounted properly for its Enron transactions; and a downgrading of Chase's credit rating.

In an effort to address the requirement that absent a pre-suit demand on the Board, shareholder plaintiffs in a derivative action must allege that such a demand would have been futile, plaintiffs allege that: Chase and its predecessors had been involved in the same fraudulent practice with the loans disguised as forward sale commodities contracts for over seven years; the Sumitomo law suit over the fraudulent practice was brought during the time that the similar Enron transactions were occurring; the transactions collectively amounted to billions of dollars, hence exposing Chase and its predecessor to huge potential losses; the nature of the transactions caused discrepancies in Chase's financial records; the two committees set up by the Board to oversee such transactions, the risk policy and audit committees, either knew of these transactions or were remiss in exercising their oversight responsibilities and were, in effect, little more than smoke screens to protect the Board from liability; the Board abetted the Enron fraud by permitting unidentified Chase executives to invest in Enron's LJM2 partnership; the Board failed to establish procedures to enable the individual defendants "to monitor the myriad red flags visible to all but those turning a blind eye to them" which should have warned the Board members of Chase's enormous financial exposure as a result of the forward sale commodities contract transactions; and the Board members faced a substantial likelihood of liability in connection with "their repeated intentional or reckless conduct in approving or, with conscious disregard, failing to prevent the Company's participation in the Enron fraud and/or abdicating their financial duty to insure that Chase had an enforced policy to ensure the propriety of the transactions."

Delaware law requires, generally, that as a condition precedent to a plaintiff bringing a shareholder derivative lawsuit, said plaintiff must make a pre-suit demand upon the board of directors to prosecute the contemplated action (*Aronson v Lewis*, 473 A2d 805, 811-812 [Del 1984], *overruled on other grounds by Brehm v Eisner*, 746 A2d 244 [Del 2000]). However, the plaintiff need not meet this requirement if he sets forth in the complaint *particularized factual allegations* sufficient to create a reasonable doubt either as to whether the directors are disinterested and independent or whether the transaction at issue resulted from a valid exercise of business judgment (Rules of Del Ch Ct

rule 23.1; *Aronson v Lewis*, 473 A2d at 814). Where the derivative claim complains of the board's nonfeasance, as opposed to a business decision, a court need only "determine whether or not the particularized factual allegations . . . create a reasonable doubt that . . . the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand" (*Rales v Blasband*, 634 A2d 927, 934 [Del 1993]).

"A director is considered interested where he or she will receive a personal financial benefit from a transaction that is not equally shared by the stockholders [citation omitted]. Directorial interest also exists where a corporate decision will have a materially detrimental impact on a director, but not on the corporation and the stockholders. In such circumstances, a director cannot be expected to exercise his or her independent business judgment without being influenced by the adverse personal consequences resulting from the decision" (*Rales v Blasband*, 634 A2d at 936). "Directors who are sued for failure to oversee subordinates have a disabling interest when 'the potential for liability is not "a mere threat" but instead may rise to "a substantial likelihood"'" (*In re Baxter Intl., Inc. Shareholders Litig.*, 654 A2d 1268, 1269 [Del Ch 1995], quoting *Rales v Blasband, supra* at 936, quoting *Aronson v Lewis*, 473 A2d at 815).

In the case before us, the motion court erred by failing to take cognizance of the Delaware pleading requirement that demand futility be supported by particularized factual allegations. The court cited Delaware law, as noted, *supra*, with regard to when a pre-suit demand that the board bring suit on a putative claim will be excused, and also made reference to the CPLR 3211 (a) (7) standard for challenging the legal sufficiency of a claim, but never discussed or applied the Delaware pleading requirement (Rules of Del Ch Ct rule 23.1). Had the court done so, it would have concluded, as we do, that the plaintiff shareholders did not allege sufficiently particularized facts to support their contention that a pre-suit demand to the board would have been futile and, consequently, that said claim should be dismissed (*see Wilson v Tully*, 243 AD2d 229 [1998]).

Examples of insufficient particularity are pervasive in plaintiffs' pleading. The allegation that Chase executives, unnamed, invested in and profited from the Enron LJM2 partnership does not allege that any individual Board members did so. The allegation that Chase's losses were the reckless result of ei-

ther the individual Board members' knowing approval of the Enron forward sale contracts, or of the Board's sustained, systematic failure to establish an effective system of internal reporting and controls, is not supported by specific facts showing either that the Board members approved of those transactions or the nature of the purported systematic failure to provide appropriate oversight. Plaintiffs' pleadings never state what the allegedly ignored "myriad red flags" were, other than the Sumitomo transactions and lawsuit, of which there is no allegation that the Board members were aware, or what additional measures the Board might have taken. Hence, the complaint on its face fails to allege, in requisite detail, the substantial likelihood of the directors' liability.

Accordingly, the order of the Supreme Court, New York County (Richard B. Lowe, III, J.), entered August 13, 2003, which denied defendants' motion to dismiss the complaint pursuant to CPLR 3211 (a) (7) on the ground that plaintiffs failed to make a pre-suit demand upon the board of directors to prosecute the claims asserted against defendants, or, in the alternative, to sufficiently allege that such a demand would be futile, should be reversed, on the law, with costs, defendants' motion granted and the complaint dismissed. The Clerk is directed to enter judgment accordingly.

BUCKLEY, P.J., SULLIVAN and GONZALEZ, JJ., concur.

Order, Supreme Court, New York County, entered August 13, 2003, reversed, on the law, with costs, defendants' motion granted and the complaint dismissed. The Clerk is directed to enter judgment accordingly.