# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| WALTER E. RYAN, JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| NAREN GURSAHANEY, THOMAS | ) | |
| COLLIGAN, TIMOTHY DONAHUE, | ) | |
| ROBERT DUTKOWSKY, BRUCE | ) | C.A. No. 9992-VCP |
| GORDON, BRIDGETTE HELLER, | ) | |
| KATHLEEN HYLE, DINESH PALIWAL, | ) | |
| KEITH MEISTER, and CORVEX | ) | |
| MANAGEMENT LP, | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| THE ADT CORPORATION, a Delaware | ) | |
| Corporation, | ) | |
| | ) | |
| Nominal Defendant. | ) | |

## MEMORANDUM OPINION

Date Submitted:  December 8, 2014
Date Decided:  April 28, 2015

Jessica Zeldin, Esq., ROSENTHAL, MONHAIT & GODDESS, P.A., Wilmington, Delaware; Clinton A. Krislov, Esq., Michael R. Karnuth, Esq., Christopher M. Hack, Esq., KRISLOV & ASSOCIATES, LTD., Chicago, Illinois; Merrill G. Davidoff, Esq., Lawrence Deutsch, Esq., Robin Switzenbaum, Esq., BERGER & MONTAGUE, P.C., Philadelphia, Pennsylvania; *Attorneys for Plaintiff Walter E. Ryan, Jr.*

Stephen P. Lamb, Esq., Daniel A. Mason, Esq., PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP, Wilmington, Delaware; Daniel J. Kramer, Esq., Robert N. Kravitz, Esq., PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP, New York, New York, Alexandra M. Walsh, Esq., PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP, Washington, D.C.; *Attorneys for Defendants Naren Gursahaney, Thomas Colligan, Timothy Donahue, Robert Dutkowsky, Bruce Gordon, Bridgette Heller, Kathleen Hyle, Dinesh Paliwal and Nominal Defendant The ADT Corporation.*

Brock E. Czeschin, Esq., A. Jacob Werrett, Esq., RICHARDS, LAYTON & FINGER P.A., Wilmington, Delaware; Nancy Chung, Esq., Michael A. Asaro, Esq., Patrick M. Mott, Esq., AKIN GUMP STRAUSS HAUER & FELD LLP, New York, New York; *Attorneys for Defendants Keith Meister and Corvex Management LP.*

**PARSONS, Vice Chancellor.**

The plaintiff in this case, a stockholder of The ADT Corporation, seeks to bring a derivative action on behalf of the company against its board of directors. In 2012, a hedge fund acquired a 5% stake in ADT, and the fund's principal contended publicly that the company would benefit from incurring debt to repurchase a significant portion of its common stock. The plaintiff alleges that the director defendants breached their fiduciary duties by appointing the hedge fund's principal to the board, engaging in a stock repurchase plan similar to the one he advocated for, and then ultimately repurchasing the hedge fund's block of ADT stock at the then-prevailing, but allegedly inflated, market price. The plaintiff also accuses the hedge fund of aiding and abetting the director defendants' alleged breaches of fiduciary duty, and charges the fund and its principal with unjust enrichment.

The director defendants moved to dismiss the complaint, as did the hedge fund and its principal. They all contend that, because the plaintiff did not make a pre-suit demand on the board of directors, and demand is not excused in these circumstances, this action should be dismissed under Court of Chancery Rule 23.1. Each of the defendants also argue that, under Rule 12(b)(6), the complaint fails to state a claim against them. For the reasons stated in this Memorandum Opinion, I conclude that demand is not excused

1

under *Aronson v. Lewis*[1] and its progeny.  Accordingly, I grant the defendants' motion to dismiss under Rule 23.1 and do not reach their other arguments in favor of dismissal.

## I.  BACKGROUND[2]

### A.  Facts

Plaintiff Walter E. Ryan, Jr. brings this action derivatively on behalf of The ADT Corporation ("ADT" or the "Company").  ADT, a Delaware corporation based in Florida, is an alarm and security systems company.  Its stock began trading on the NYSE in September 2012, when the Company was spun off from Tyco International, Inc. ("Tyco").  Ryan has owned shares of ADT common stock continuously since that time.

---

[1] 473 A.2d 805 (Del. 1984).  In *Brehm v. Eisner*, 746 A.2d 244, 253-54 (Del. 2000), the Delaware Supreme Court overruled seven precedents, including *Aronson*, to the extent those precedents reviewed a Rule 23.1 decision by the Court of Chancery under an abuse of discretion standard or otherwise suggested deferential appellate review.  *See id.* at 253 n.13 (overruling in part on this issue *Scattered Corp. v. Chicago Stock Exch.*, 701 A.2d 70, 72-73 (Del. 1997); *Grimes v. Donald*, 673 A.2d 1207, 1217 n.15 (Del. 1996); *Heineman v. Datapoint Corp.*, 611 A.2d 950, 952 (Del. 1992); *Levine v. Smith*, 591 A.2d 194, 207 (Del. 1991); *Grobow v. Perot*, 539 A.2d 180, 186 (Del. 1988); *Pogostin v. Rice*, 480 A.2d 619, 624-25 (Del. 1984); and *Aronson*, 471 A.2d at 814).  The *Brehm* Court held that going forward, appellate review of a Rule 23.1 determination would be *de novo* and plenary.  *Brehm*, 746 A.2d at 254.  The seven partially overruled precedents otherwise remain good law.  In this decision, I do not rely on any of them for the standard of appellate review.  Although the technical rules of legal citation would require noting that each was reversed on other grounds by *Brehm*, I have chosen, as this Court has on other occasions, to omit the cumbersome subsequent history, which creates the misimpression that *Brehm* rejected core elements of the Delaware derivative action canon.  *See Quadrant Structured Prods. Co. v. Vertin*, 102 A.3d 155, 181 n.7 (Del. Ch. 2014).

[2] The facts are drawn from Plaintiff's Verified Amended Derivative Complaint (the "Complaint") and the documents attached or integral thereto.

Defendant Naren Gursahaney is the CEO and a director of ADT. Defendants Thomas Colligan, Timothy Donahue, Robert Dutkowsky, Bruce Gordon, Bridgette Heller, Kathleen Hyle, and Dinesh Paliwal (together with Gursahaney, the "Board" or the "Director Defendants") also were ADT directors at all relevant times.[3]

Defendant Keith Meister was a member of ADT's board of directors from December 2012 to November 2013. Meister also is the founder, managing director, and principal partner of Defendant Corvex Management LP ("Corvex"), a Delaware limited partnership with its principal place of business in New York. Corvex is a hedge fund, and from October 2012 to November 2013, it owned or controlled roughly 5% of ADT's issued and outstanding common stock.

### 1. Corvex takes a position in ADT, and the Board responds

In the process of dividing itself into three separate companies, Tyco spun off its security solutions division into an independent entity, ADT. On September 28, 2012, Tyco stockholders, including Plaintiff, received one-half share of ADT stock for each share of Tyco stock they owned. From the time of the spinoff through late October 2012, Corvex accumulated a 5% stake in ADT, at prices ranging from $36 to $39 per share.[4] One day before disclosing its ADT investment to the Securities and Exchange

---

[3] Defendant Paliwal resigned from ADT's Board effective March 13, 2014, before the commencement of this action. Each of the other Director Defendants still holds the position of director.

[4] In addition to owning shares and call options for a total of roughly 11 million shares, Corvex also shared voting power over 575,000 shares of ADT beneficially owned by Soros Fund Management LLC ("Soros"). Compl. ¶ 22.

Commission ("SEC") on October 25, 2012, Corvex made a public presentation at an investing conference. In that presentation, according to the Complaint, Meister asserted that ADT was undervalued and would outperform its financial expectations. Meister criticized ADT's capital structure, however. In particular, he argued that unlocking ADT's true value would require the Company to incur more debt and repurchase stock, with a goal of raising its ratio of debt to EBITDA from 1.5x to 3.0x. He estimated that those maneuvers would double ADT's stock price from its current $30 to $40 per share range, and provide significant returns to the stockholders.[5]

ADT's management and several directors met with Meister on November 17, 2012, and he reiterated those investment theses to them. On November 26, the full Board met telephonically. Among the subjects they discussed were the Company's capital allocation and the merits of a share repurchase program. The Board also was informed that Meister wanted to become a director of the Company. The following day, ADT publicly announced its financial results for the fourth quarter of fiscal year 2012 and provided its forecasts for 2013.[6] The Board also announced that it had approved a stock repurchase program, pursuant to which the Company planned to buy back 17% or $2 billion of its common stock over the next three years, thereby raising its debt to EBITDA ratio to 2.0x (the "Stock Repurchase Program").

---

[5]    *Id*. ¶¶ 23-34.

[6]    ADT's 2012 fiscal year ended on September 28, 2012; its 2013 fiscal year ended September 27, 2013.

4

In the meantime, Meister continued to seek appointment to ADT's board. In this regard, Plaintiff's allegations focus on a December 13, 2012 Board meeting at which Defendant Gordon, Chairman of the Board, advised the other directors that if Meister were not asked to join the Board, Corvex "likely" would make a stockholder proposal to get himself and possibly other nominees elected. The meeting minutes allegedly state that the "cost and distraction of any potential proxy contest, the likely consequences of winning or losing such a contest, and Mr. Meister's qualification to serve as a Director of ADT" were among the topics the Board considered as to whether Meister should be appointed as a director.[7]

In discussing this issue, the Director Defendants also heard presentations or "pitches" from the investment banking firms of MacKenzie Partners, Goldman Sachs, Credit Suisse, and Lazard Freres. Although it is not alleged that any of them actually were hired to advise the Board, the firms' various pitch presentations discussed Corvex's investment history and gauged the potential that it would take an aggressive, activist stance toward ADT. Quoting from these presentations, the Complaint reveals that the Board was informed, for example, that Corvex "has positioned itself as a traditional non-activist hedge fund," and "has vowed to be less confrontational" than Meister's former employer, Carl Icahn.[8] On the other hand, it was reported that Corvex previously

---

[7] Compl. ¶ 41.

[8] *Id*. ¶ 38.

"demonstrated a willingness to escalate to a proxy fight" when a company in which it had invested did not fully implement its demands.[9]

The Board met again on December 14, 2012 to continue its discussion and reach a decision. Three days later, ADT publicly announced that it had entered a standstill agreement with Meister, Corvex, and Soros (the "Standstill Agreement").[10] Pursuant to that agreement, the size of ADT's Board was increased from eight to nine members, and Meister was appointed to fill the new vacancy. The Standstill Agreement also provided that Meister, Corvex, and Soros would vote in favor of the Company's slate of directors (including Meister), and that they would not acquire more than a prescribed number of shares of ADT stock. The Standstill Agreement was to expire on the date Meister left the Board or December 5, 2013, whichever was later. The December 5 date was one week before the deadline for stockholder proposals and nominations relating to ADT's 2014 annual meeting. Effective December 19, 2012, Meister joined ADT's Board as a director.

### 2. ADT continues repurchasing stock, and Corvex exits

Plaintiff asserts that increased competition negatively affected ADT's business through the first half of 2013, making Meister's lofty expectations look more and more unrealistic. On July 31, 2013, ADT released its financial results for the third quarter of its 2013 fiscal year. As part of that announcement, ADT disclosed that it had decided to

---

[9]    *Id.*

[10]    *Id.* ¶ 42.

6

increase its leverage ratio further to 3.0x debt to EBITDA, signaling a likely increase in the ongoing Stock Repurchase Program. Meister, then a member of the ADT Board, allegedly pushed for even more accelerated stock repurchases. According to the Complaint, the Board received materials from consultants at Centerview Partners indicating that if the Company did not adopt Corvex's preferred timetable for accomplishing the leveraged buybacks, Corvex might "present an alternative capital allocation framework (a 'Public IPO') and run a competing slate of directors" to be voted on at ADT's 2014 annual meeting.[11]

The Board met on September 7 and September 20, 2013, and Corvex's proposal for accelerating the ongoing stock repurchases was among the items discussed.[12] On September 23, ADT announced a special dividend, and disclosed a plan to offer $1 billion in new debt. The Company released its financial results for the fourth quarter of its 2013 fiscal year on November 20, 2013. In that announcement, ADT authorized an increase in the next quarterly dividend, and provided an update on the Stock Repurchase Program. About $1.6 billion of stock already had been repurchased, and the Company disclosed an agreement to buy another $400 million of stock back from JP Morgan Chase. ADT further disclosed that the initial $2 billion phase of the Stock Repurchase Program would be completed by the first half of fiscal year 2014, and that the Board had

---

[11]     *Id*. ¶ 69. That meeting was expected to occur early in calendar year 2014.

[12]     The Complaint does not allege whether Meister attended these meetings. *See id*. ¶¶ 70-74.

7

increased the repurchase authorization from $2 to $3 billion. As the market digested these announcements, ADT's stock traded moderately upward, to around $44 per share.

The Complaint accuses Corvex and Meister of pursuing a self-interested "pump-and-dump" scheme. In that regard, Plaintiff casts all the Director Defendants' actions—from appointing Meister to the Board in the Standstill Agreement to adopting the leveraged Stock Repurchase Plan—as reflecting the directors' acquiescence to Meister's proposals and demands in support of that scheme.[13] Plaintiff asserts that by the second half of 2013, Meister had succeeded in "pumping" up the price of ADT's stock. The alleged "dump" came on November 25, 2013, when the Board announced that it had entered into an agreement to repurchase most of Corvex's ADT stock (the "Corvex Repurchase") at the then-prevailing market price. ADT agreed to pay $44.01 per share or roughly $450 million in the Corvex Repurchase, and Corvex allegedly reaped a profit of $60 million. In exchange, Meister agreed to step down from the Board, and he and Corvex accepted an amendment to the Standstill Agreement under which it would remain effective until the Company's 2019 annual meeting.

The Complaint criticizes the Corvex Repurchase as nefarious "hush mail."[14] Plaintiff also takes particular issue with the fact that the price was fixed at $44.01 per share, in contrast to the JPMorgan Chase buyback and a similar one entered into with Credit Suisse shortly thereafter. Both of those transactions allegedly were structured

---

[13]    *E.g.*, *id.* ¶¶ 1, 42, 61, 62, 69, 81, 97, 101.

[14]    *Id.* ¶¶ 89, 96.

8

such that ADT would repurchase the stock at a volume-weighted price calculated over time, to adjust for any abnormal returns associated with the buyback itself. Shortly after the Corvex Repurchase, the market price of ADT's stock slipped to about $40 per share.[15]

On or about December 9, 2013, the Board received materials in preparation for an upcoming meeting. That information allegedly identified and highlighted ongoing risks ADT was facing, including increased competition, lower sales, and higher customer attrition rates. On January 30, 2014, ADT released its report for the fiscal quarter ending December 31, 2013. According to the Complaint, the reported financial results "badly missed the Company's guidance and analysts' consensus estimates and revealed a far-worse-than-forecasted financial condition and diminished future prospects."[16]

Plaintiff asserts that Meister "undoubtedly knew" these "non-public facts" when the Corvex Repurchase was negotiated and executed.[17] According to the Complaint, Barclays issued a report in the wake of the January 30, 2014 announcement questioning the structure of the Corvex Repurchase.[18] ADT's stock price dropped to about $31 per share as of the close of trading on January 30, 2014, and settled around $28 per share in the first few days of February. Based on these allegations, the Complaint avers that the Director Defendants "misallocated the Company's resources to incur debt and overpay

---

[15]     *Id.* ¶ 85.

[16]     *Id.* ¶ 91.

[17]     *Id.* ¶ 90.

[18]     *Id.* ¶ 93.

for its own stock through significant stock repurchases, including those from Corvex, an effective insider.[19]

### B. Procedural History and Parties' Contentions

Plaintiff filed this derivative action on August 1, 2014, and amended his complaint on October 3, 2014. As amended, the Complaint charges the Director Defendants with breaching their fiduciary duties of care and loyalty, and accuses Corvex of aiding and abetting those alleged breaches. Meister and Corvex also are subject to an additional claim for unjust enrichment. The Director Defendants and Meister and Corvex each filed motions to dismiss this action. Those motions were fully briefed, and I heard argument as to both on December 8, 2014.

The Director Defendants seek dismissal of the Complaint under Court of Chancery Rule 23.1, contending that Plaintiff failed to make a pre-suit demand on ADT's board, or to plead adequately that such a demand would have been futile. In the alternative, they argue that the Complaint fails to state a claim under Rule 12(b)(6). Meister and Corvex join the Director Defendants in asserting that the Complaint should be dismissed in its entirety for failure to plead demand futility. In addition, Meister and Corvex further contend that, even if demand were not futile, the claims against them must be dismissed on Rule 12(b)(6) grounds.

Plaintiff concedes he made no pre-suit demand on the ADT Board, but maintains that the Complaint alleges sufficient facts to demonstrate that demand was excused. In

---

[19] *Id.* ¶ 96.

10

particular, he contends that any demand would have been futile because: (1) the Board was not disinterested and independent with respect to the decisions relating to the Standstill Agreement, the Stock Repurchase Program, and the Corvex Repurchase; and (2) the Complaint's allegations as to those transactions are sufficient to rebut the protection of the business judgment rule. As to both of those contentions, Plaintiff asserts that the Director Defendants "feared for their positions because Meister threatened to seek their replacement in two separate instances and in response, secured for themselves two Standstill Agreements from Meister and Corvex."[20] In this regard, Plaintiff argues that, in assenting to the Standstill Agreement and later the Corvex Repurchase, the Director Defendants were motivated solely by a desire to entrench themselves. Plaintiff further asserts that the Director Defendants' acceptance of the Corvex Repurchase at a fixed per-share price over $44 was an "absolute failure" to increase stockholder value, because they allegedly knew that the stock price was inflated and would decline after the Corvex Repurchase was announced. Based on those allegations, Plaintiff argues that pre-suit demand was futile and therefore excused.

## II.    ANALYSIS

I address Defendants' Rule 23.1 argument first. For the reasons set forth below, I agree that the Complaint fails to plead adequately that demand was excused. Because such a failure requires dismissal of the Complaint in its entirety, I do not address the separate arguments for and against dismissal on grounds of Rule 12(b)(6).

---

[20]     Pl.'s Answering Br. 28; *id.* at 38-39.

11

## A. Legal Standard

Under Court of Chancery Rule 23.1, a stockholder plaintiff seeking to bring an action derivatively on behalf of the corporation must "allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and the reasons for the plaintiff's failure to obtain the action or for not making the effort."[21] The demand requirement in Rule 23.1 is "a recognition of the fundamental precept that directors manage the business and affairs of corporations."[22] Accordingly, the right of a stockholder to prosecute a claim of the corporation on its behalf is limited to situations where either: (1) the stockholder has demanded that the directors pursue a corporate claim and the directors wrongfully have refused to do so; or (2) demand is excused because the directors are incapable of making an impartial decision regarding whether to institute such litigation.[23]

In cases like this one, where Plaintiff did not make pre-suit demand upon the Company's board of directors, the Complaint must be dismissed unless it alleges particularized facts showing that demand would have been futile.[24] The well-known *Aronson* test controls my determination of whether demand is excused as futile in a case

---

[21]  Ct. Ch. R. 23.1(a).

[22]  *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984); *see also* 8 *Del. C.* § 141(a).

[23]  *Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 366-67 (Del. 2006).

[24]  *In re Citigroup Inc. S'holder Deriv. Litig.*, 964 A.2d 106, 132 (Del. Ch. 2009) (citing *Stone,* 911 A.2d at 367 n.9).

such as this, where Plaintiff alleges that the Director Defendants made a decision or took an action in breach of their fiduciary duties.[25] A plaintiff demonstrates demand futility under *Aronson* and its progeny by pleading particularized facts that create a reasonable doubt as to whether: (1) the directors made the challenged decision with disinterestedness and independence; or (2) the challenged decision or transaction was otherwise the product of a valid exercise of business judgment.[26] Because the "stringent requirements" of Rule 23.1 govern here, as opposed to the lesser requirements of ordinary notice pleading, Plaintiff must set forth the "*particularized* factual statements that are essential to the claim."[27] In assessing whether Plaintiff has met his pleading burden in this regard, I accept all non-conclusory allegations in the Complaint as true and draw all reasonable factual inferences that logically flow from them in Plaintiff's favor.[28]

**B.      The Complaint Does Not Give Reason to Doubt the Board's Disinterestedness and Independence**

Under the first prong of *Aronson*, demand is excused as futile if the Complaint raises a reasonable doubt that the Board will be entitled to the protection of the business

---

[25]     *Wood v. Baum*, 953 A.2d 136, 140 (Del. 2008); *compare Rales v. Blasband*, 634 A.2d 927, 936-37 (Del. 1993) (stating standard of review for demand futility in situations "where the board that would be considering the demand did not make a business decision which is being challenged in the derivative suit").

[26]     *Wood*, 953 A.2d at 140; *see also Aronson*, 473 A.2d at 814.

[27]     *Brehm*, 746 A.2d at 254 (emphasis added).

[28]     *Id.* at 255; *see also Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1048-49 (Del. 2004); *Citigroup*, 964 A.2d at 120.

judgment rule with respect to the challenged transaction.[29] The relevant inquiry in this regard is whether a majority of the Director Defendants were either interested in the challenged transaction or lacked the independence necessary to make the challenged decision on its merits rather than on the basis of extraneous influences, such as being beholden to or otherwise under the influence of another.[30]

In this case, Plaintiff does not attempt to allege a conflict of interest in the classic sense of self-dealing. The *Aronson* line of cases also recognizes, however, that a stockholder derivative plaintiff can raise a reasonable doubt as to the board's disinterestedness and independence in situations where the particularized factual allegations demonstrate that the directors' sole or primary motivation was entrenchment.[31] Plaintiff's argument as to the futility of demand relies heavily on his contention that the Director Defendants were driven by a desire to entrench themselves. In that regard, Plaintiff contends that the Complaint contains particularized allegations that the Director Defendants "believed themselves to be vulnerable" to removal by Corvex, and that the primary reason they agreed to the Standstill Agreement, the Stock

---

[29]     *Aronson*, 473 A.2d at 814-15.

[30]     *Id*.; *see also Rales*, 634 A.2d at 936-37 (defining "interest" and "independence").

[31]     *Grobow v. Perot*, 539 A.2d 180, 188 (Del. 1988) ("In order to satisfy *Aronson*'s first prong involving director disinterest, plaintiffs must plead particularized facts demonstrating either a financial interest or entrenchment on the part of the GM directors.") (citing *Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946 (Del. 1985)).

Repurchase Program, and the Corvex Repurchase was to avoid this possibility.[32] The non-conclusory allegations in the Complaint, however, do not raise a reasonable doubt as to the Director Defendants' disinterestedness or independence based on this entrenchment theory, for several reasons.

### 1. Actual Threat of Removal

First, the particularized facts do not support a reasonable inference that the Director Defendants perceived an actual "threat" of removal and were motivated to avoid it. Corvex is not alleged to have initiated a proxy contest or other public campaign to remove one or more ADT directors. The Complaint does not allege that Meister or Corvex even took any preliminary steps to prepare for such an endeavor. The strongest non-conclusory, particularized allegations in this regard are two-fold: (1) that ADT's Board Chairman, Defendant Gordon, stated (before the Board voted in December 2012 to appoint Meister a director and obtain the Standstill Agreement) that Corvex "likely" would make a stockholder proposal to elect Meister and possibly others to the Board; and (2) that the pitch presentation materials the Board received from at least two financial advisors contained similar indications that Corvex could or might become aggressive and run a proxy contest or other activist campaign.

Even taking those allegations as true and drawing all reasonable inferences from them in Plaintiff's favor, however, I cannot conclude, in light of the relevant case law, that the allegations suggest the existence of a "threat" sufficient to rebut the business

---

[32]     Pl.'s Answering Br. 31.

judgment rule and raise a doubt as to the Director Defendants' disinterestedness and independence for purposes of *Aronson*.[33] In *Grobow v. Perot*, the Delaware Supreme Court addressed an argument by stockholder derivative plaintiffs that demand should be excused as futile. As in this case, the plaintiffs there challenged a decision of a board of directors to repurchase the stock of a dissident stockholder.[34] The plaintiffs in *Grobow* contended that the General Motors ("GM") board lacked disinterestedness and independence for purposes of considering a demand because, pursuant to the buyback agreement, the GM board paid a significant premium over the per-share market price, and the dissident stockholder agreed to stop publicly criticizing the board and promised not to buy GM stock or run a proxy contest for five years.[35] The *Grobow* Court held that the plaintiffs' allegations, which attempted to invoke *Unocal*-type heightened scrutiny, were "too speculative to raise a reasonable doubt of director disinterest" under the first prong

---

[33] *See, e.g.*, *Kahn ex rel. DeKalb Genetics Corp. v. Roberts*, 679 A.2d 460, 466 (Del. 1996) ("Absent an actual threat to corporate control or action substantially taken for the purpose of entrenchment, the actions of the board are judged under the business judgment rule.") (rejecting stockholder derivative plaintiff's argument that demand was excused as futile where the board had entered into a repurchase agreement with a dissident stockholder, because the purported threat of removal was "ephemeral" and too speculative to justify rebuttal of the business judgment rule).

[34] *Grobow*, 539 A.2d at 188.

[35] *Id.* at 184-85.

of *Aronson*, because the directors' positions were not "actually threatened."[36] Rather, the plaintiffs "merely argue[d]" that Perot's public criticism of GM management "*could* cause the directors embarrassment sufficient to lead to their removal from office."[37] The Court concluded that "[s]uch allegations are patently insufficient to raise a reasonable doubt as to the ability of the GM Board to act with disinterest," and it therefore found the plaintiffs' "entrenchment claim to be essentially conclusory and lacking in factual support sufficient to establish [demand] excusal."[38] In so holding, the *Grobow* Court expressly considered the premium paid to Perot, the allegedly ill-considered nature of the repurchase transaction, and the "hush mail" aspect of that agreement.[39]

Plaintiff's allegations here are insufficient to satisfy *Aronson*'s first prong on an

---

[36] *Id.* at 188. The dissident in *Grobow*, H. Ross Perot, held only 0.8% of GM's voting stock, but the value of his stock (and contingent notes he held) was substantial, making him GM's largest stockholder. *Id.* at 184.

[37] *Id.* (emphasis added).

[38] *Id.*

[39] *Id.* After the Supreme Court's decision in *Grobow*, the plaintiffs amended their complaint and again sought to plead demand futility. The Court of Chancery refused to re-hear the plaintiffs' entrenchment argument, despite their contention that its deficiencies had been "cured, because their present complaint now alleges that [the dissident stockholder] forcibly and publicly advocated that the GM Board should be replaced." *Grobow v. Perot*, 1990 WL 146, 16 Del. J. Corp. L. 310, 320 (Del. Ch. Jan. 3, 1990), *aff'd sub nom. Levine v. Smith*, 591 A.2d 194 (Del. 1991). The Court noted that, even if the plaintiffs could re-litigate the entrenchment issue, their amended complaint still failed to raise a doubt as to the GM board's disinterestedness and independence, because it still had "not alleged that [the dissident stockholder] took or threatened to take any concrete action to unseat the Board, such as commencing a tender offer or a proxy or consent solicitation. The plaintiffs have not, therefore, adequately alleged that [he] posed a genuine threat to the Board . . . ." *Id.* at 320 n.7.

17

"entrenchment" theory because, like the plaintiffs in *Grobow*, Plaintiff has not alleged that the Director Defendants were "actually threatened" with removal from their positions by Corvex and Meister. At most, the Complaint alleges that Corvex and Meister *might* have attempted to remove the Director Defendants from their board positions, if the Board refused to appoint Meister in the first place, or refused to adopt a leveraged stock repurchase strategy as he advocated for, or refused to enter into the Corvex Repurchase Agreement. As to any of those three decision points, however, the Complaint does not allege that Corvex or Meister actually took action aimed at removing one or more of the Director Defendants, by running a competing slate of directors, making a tender offer, or otherwise.

The Complaint does not even allege that Meister or Corvex publicly advocated for the Board's removal. The only particularized factual allegations supporting the proposition that the Director Defendants actually perceived a threat of removal— Defendant Gordon's opinion as to the possibility of Corvex becoming more aggressive in December 2012, and the pitch presentation materials—are "tenuous at best and are too speculative to raise a reasonable doubt of director disinterest."[40] If anything, those allegations merely underscore that a control contest against which the Board might choose to defend was something that may have arisen in the future. The speculative nature of that possibility is particularly acute in a case like this where Corvex held only 5% of ADT's stock. Moreover, there are no allegations that other hedge funds that held a

---

[40] *Grobow*, 539 A.2d at 188.

significant amount of ADT stock were coordinating with Corvex or otherwise following its lead.[41]

Cases like *Grobow* instruct that absent an actual (as opposed to possible or theoretical) "struggle for corporate control," the presumption of directorial disinterestedness and independence is not rebutted under the *Aronson* analysis.[42] The Complaint in this case fails adequately to allege any such actual struggle. Thus, based on the lack of particularized factual allegations suggesting that the Board perceived an "actual threat" of removal, I reject Plaintiff's contention that demand upon the ADT Board was futile because the Director Defendants sought to entrench themselves.

### 2.    Entrenchment Motivation

Second, even if the Complaint had alleged particularized facts that supported a reasonable inference that the threat of removal facing the Director Defendants was more than speculative, Plaintiff's entrenchment theory still fails to demonstrate demand futility under *Aronson*'s first prong. The reason is that the Complaint lacks sufficient allegations

---

[41]    Compl. ¶ 38. In that respect, I note that this Court's determination of whether a stockholder poses an "actual threat" for purposes of entrenchment allegations is a context-specific analysis in which the size of the dissident stockholder's ownership stake is one consideration. *See, e.g.*, *Grobow*, 539 A.2d at 188 (rejecting demand futility argument based on entrenchment theory; 0.8% stockholder); *Kahn*, 679 A.2d at 466 (same; 33% stockholders); *Green v. Phillips*, 1996 WL 342093, at *4 (Del. Ch. June 19, 1996) (same; 10.7% stockholder); *but see In re Chrysler Corp. S'holders Litig.*, 1992 WL 181024, 18 Del. J. Corp. L. 619, 627 (Del. Ch. July 27, 1992) (finding demand excused because of well-pled entrenchment allegations relating to a poison pill; 9.8% stockholder).

[42]    *Grobow*, 539 A.2d at 188; *see also Kahn*, 679 A.2d at 466.

to impugn the Director Defendants' motivation in appointing Meister to the Board, approving the Stock Repurchase Program, and agreeing to the Corvex Repurchase. To demonstrate demand futility under *Aronson*, "[i]t is the plaintiff's burden to allege with particularity that the [claimed] improper motive in a given set of circumstances, i.e., perpetuation of self in office or otherwise in control, was the sole or primary purpose of the wrongdoer's conduct."[43]

Seven of the nine members of ADT's Board during the relevant time period were independent, non-management directors.[44] The Complaint's only allegations bearing on the interest or motivations of those Defendants is that they sought to entrench themselves in order to maintain their director compensation. The Complaint does not allege,

---

[43] *Pogostin v. Rice*, 480 A.2d 619, 627 (Del. 1984); *see also Benihana of Tokyo, Inc. v. Benihana, Inc.*, 906 A.2d 114, 121-22 (Del. 2006) ("It is settled law that, 'corporate action . . . may not be taken for the sole or primary purpose of entrenchment.'") (alteration in original) (quoting *Williams v. Geier,* 671 A.2d 1368, 1381 n.28 (Del. 1996)).

[44] It appears to be undisputed that Defendant Gursahaney, CEO of ADT, was either interested or lacked independence. Defs.' Opening Br. 3. Defendant Meister was not involved in the Board decision that led to his appointment, but was a director during the rest of the relevant period. He does not contest that, as the principal of Corvex, he had a conflict of interest with respect to the Corvex Repurchase. Corvex Opening Br. 17. The Complaint does not allege, however, that Meister participated in either the Board's discussions or voting on the Corvex Repurchase. Ultimately, I find that Gursahaney and Meister's conflicts of interest are not likely to have any impact on the issues decided in this Memorandum Opinion, because none of the other seven directors are alleged to have had any such conflict or lack of independence, and the relevant inquiry under the first prong of *Aronson* is whether there is a reasonable doubt as to the disinterestedness and independence of a *majority* of the directors. *See, e.g.*, *Wood*, 953 A.2d at 141; *Citigroup Inc.*, 964 A.2d at 121.

however, that the compensation paid to the Director Defendants was extraordinary or excessive. Nor does Plaintiff identify any reason why, in the particular circumstances of this case, the Court should conclude that the compensation package unduly influenced one or more of the directors' decisionmaking.[45] Delaware law is clear that absent particularized factual allegations indicating such a disabling conflict, "ordinary director compensation alone is not enough to show demand futility."[46]

The Complaint and Plaintiff's arguments make clear that he disagrees with the decisions made by the ADT Board during the relevant time period. The Complaint does not provide the Court any reason, however, to doubt that a majority of the Director Defendants were disinterested and independent with respect to the challenged actions. Plaintiff has not alleged a conflict of interest and has failed to allege non-conclusory facts from which I could infer that the Director Defendants sought to entrench themselves. Thus, demand is not excused as futile under the first part of the *Aronson* analysis.

---

[45] As a general matter, a director's compensation conceivably can impact her disinterestedness and independence if, for example, "the fees were shown to exceed materially what is commonly understood and accepted to be a usual and customary director's fee." *Orman v. Cullman*, 794 A.2d 5, 20 n.62 (Del. Ch. 2002). There are no allegations in the Complaint here regarding materially excessive directors' fees having been paid to the Director Defendants.

[46] *A.R. DeMarco Enters. v. Ocean Spray Cranberries, Inc.*, 2002 WL 31820970, at *5 (Del. Ch. Dec. 4, 2002); *see also, e.g.*, *Grobow*, 539 A.2d at 188 ("The only averment permitting such an inference is the allegation that all GM's directors are paid for their services as directors. However, such allegations, without more, do not establish any financial interest.").

**C.     The Complaint also Does Not Provide a Reason to Doubt that the Challenged Transactions were a Valid Exercise of the Board's Business Judgment**

Under the second prong of the *Aronson* test, demand may be excused as futile if the complaint creates "a reasonable doubt that 'the challenged transaction was otherwise the product of a valid exercise of business judgment.'"[47] The presumption of the business judgment rule can be rebutted if the particularized facts raise a reasonable doubt "that the informational component of the directors' decisionmaking process, *measured by concepts of gross negligence*, included consideration of all material reasonably available."[48] A plaintiff seeking to establish demand futility under *Aronson*'s second prong bears a "heavy burden."[49] Here, Plaintiff failed to carry it.

The Complaint itself reveals that the Director Defendants considered the merits of all of the challenged decisions, receiving information from expert advisors and holding meetings to deliberate each of them. Perhaps because of this reality, Plaintiff's argument as to the second prong of *Aronson* largely consists of a rehash of his major argument, that demand should be excused because the Director Defendants acted to entrench themselves.[50] As discussed above, that contention is unavailing. Some additional aspects of Plaintiff's allegations, however, are relevant to his argument under *Aronson*'s second prong. In particular, Plaintiff objects to the price the Board agreed to pay in the Corvex

---

[47]     *Brehm*, 746 A.2d at 256 (quoting *Aronson*, 473 A.2d at 814).

[48]     *Id.* at 259 (citing *Aronson*, 473 A.2d at 812).

[49]     *White v. Panic*, 783 A.2d 543, 551 (Del. 2001).

[50]     Pl.'s Answering Br. 37-39.

22

Repurchase, and, in arguing that the price was too high, he suggests that the ADT Board knew that the market price of ADT stock in late 2013 was inflated. In addition, Plaintiff asserts that the Board should have negotiated for some form of price protection mechanism similar to the provisions it obtained in connection with the buybacks from JPMorgan and Credit Suisse, for example.

Even if I were to accept Plaintiff's premise in this regard—*i.e.*, that the Director Defendants knew the per-share market price was inflated and therefore that Corvex was receiving a sort of "premium" in the Corvex Repurchase—his *Aronson* argument still would be unpersuasive. In *Grobow*, the plaintiffs similarly argued that demand futility was established under *Aronson*'s second prong because the GM board had agreed to pay what the dissident stockholder called "a giant premium" to repurchase his shares. As the Supreme Court stated in rejecting that argument, "The law of Delaware is well established that, in the absence of evidence of fraud or unfairness, a corporation's repurchase of its capital stock at a premium over market from a dissident shareholder is entitled to the protection of the business judgment rule."[51]

The Complaint contains no particularized allegation of fraud as to the repurchase price, so Plaintiff's argument in this regard is, if anything, weaker than the argument the Supreme Court rejected in *Grobow*. The Complaint insinuates that the Director Defendants knew that ADT was facing stronger competitive headwinds than the

---

[51] *Id*. at 189 (citing, *inter alia*, *Polk v. Good*, 507 A.2d 531, 536 (Del. 1986); *Cheff v. Mathes*, 199 A.2d 548, 554 (Del. Ch. 1964)).

Company's public disclosures acknowledged. Although those allegations are conclusory, it ultimately is immaterial whether I would find any of them well-pled, because Plaintiff does not attempt to assert a disclosure claim or a claim for breach of the so-called "duty of disclosure."[52] Rather, Plaintiff weaves those assertions into an overarching narrative that the Director Defendants knowingly caused ADT to overpay to repurchase Corvex's stock in order to entrench themselves. As discussed, the entrenchment aspect of Plaintiff's theory is legally insufficient. The "overpayment" aspect is, too. The ADT Board agreed to repurchase Corvex's stock at the prevailing market price that (presumably) rational investors were willing to pay. Absent non-conclusory, particularized allegations to the contrary, I find it unreasonable to infer that the ADT Board was agreeing to pay a material "premium" in the Corvex Repurchase. More importantly, however, even if they had so agreed, cases like *Grobow* foreclose the possibility that such a decision would support finding demand excused under *Aronson*'s second prong, absent "evidence of fraud or unfairness" rising to the level of corporate waste.[53] I have considered Plaintiff's attempts to distinguish those cases, and I find them

---

[52] *See In re Allergan, Inc. S'holder Litig.*, 2014 WL 5791350, at \*10 (Del. Ch. Nov. 7, 2014) ("[T]here is no independent duty of disclosure under Delaware law. Instead, the duty of disclosure derives from the duty of care and the duty of loyalty."). To the extent Plaintiff might wish to have asserted such a disclosure claim based on the ADT Board's public statements about the strength of the Company's operations in light of competitive pressures, it is too late now to re-amend the Complaint. *See* Ct. Ch. R. 15(aaa).

[53] *Grobow*, 539 A.2d at 189.

unconvincing.[54]  For essentially the same reasons stated by the Supreme Court in *Grobow*, I have determined that Plaintiff has not alleged particularized facts sufficient to rebut the business judgment rule with respect to the challenged transactions.  Thus, demand is not excused under the second part of the *Aronson* test.

## III.    CONCLUSION

For the foregoing reasons, I conclude that the Complaint fails to plead adequately that demand is excused as futile under *Aronson*.  Accordingly, Defendants' motions to dismiss under Rule 23.1 are granted.  As a result, I need not reach Defendants' motions to dismiss under Rule 12(b)(6), and express no opinion as to those issues.

**IT IS SO ORDERED**.

---

[54]    Pl.'s Answering Br. 35-36; Arg. Tr. 44-50.